

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. WR–71,070–03

### EX PARTE STEPHEN DALE BARBEE, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### FROM TARRANT COUNTY

**KEEL, J., delivered the opinion of the Court in which KELLER, P.J., and HERVEY, RICHARDSON, SLAUGHTER, and MCCLURE, JJ., joined. YEARY and NEWELL, JJ., joined Part VI of the Court's opinion and otherwise concurred. WALKER, J., filed a concurring opinion.**

## OPINION

This is a subsequent application for writ of habeas corpus filed pursuant to Texas

Code of Criminal Procedure Article 11.071, Section 5. Applicant seeks relief under

*McCoy v. Louisiana*, 138 S. Ct. 1500 (2018), which he claims was a previously

unavailable legal basis for his claim. We filed and set his application to address whether

he is entitled to relief under *McCoy*. We conclude that the legal basis for the current

claim was previously available, and even if it were not, Applicant fails to allege facts that

would entitle him to relief under *McCoy*. Consequently, we dismiss this subsequent application as an abuse of the writ. TEX. CODE CRIM. PROC. art. 11.071 § 5(c).

## I. Article 11.071, Section 5

Unless an applicant for a writ of habeas corpus meets a very fine-tuned exception, he is limited to one full and fair opportunity to present any claims that may entitle him to relief from his judgment or sentence. *Ex parte Kerr*, 64 S.W.3d 414, 418-19 (Tex. Crim. App. 2002). "[E]verything you can possibly raise the first time, we expect you to raise it initially, one bite of the apple, one shot." *Id.* (quoting S.B. 440, Acts 1005, 74th Leg., codified at TEX. CODE CRIM. PROC. art. 11.071 (Presentation by Representative Pete Gallego at second reading of S.B. 440 on the floor of the House of Representatives, May 18, 1995)).

Applicant relies on the "previously unavailable legal basis" exception to the bar against subsequent applications. Under that exception, we may consider the merits of a subsequent application if it contains sufficient specific facts establishing that the claim has not been and could not have been previously presented because the legal basis for the claim was unavailable when the previous application was filed. The exception says:

> (a) If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:

> (1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant

filed the previous application[.]

TEX. CODE CRIM. PROC. art. 11.071 § 5(a)(1).

A legal basis was previously unavailable if it "was not recognized by or could not have been reasonably formulated from a final decision of" a relevant court "on or before" the date the previous application was filed. TEX. CODE CRIM. PROC. art. 11.071 § 5(d). A legal basis was previously available if it "could have been rationally fashioned" from relevant precedent, *Ex parte Navarro*, 538 S.W.3d 608, 615 (Tex. Crim. App. 2018) (construing same language as found in Texas Code of Criminal Procedure Article 11.07, Section 4(a)(1) and rejecting challenge to adequacy of juvenile transfer order), or if it is founded on "familiar principles articulated in earlier cases" from relevant courts. *See Ex parte St. Aubin*, 537 S.W.3d 39, 45 (Tex. Crim. App. 2017) (rejecting multiple-punishments, double-jeopardy claim in subsequent writ because legal basis was previously available). The likelihood of a claim's success is irrelevant to determining whether its legal basis was previously unavailable. *Navarro*, 538 S.W.3d at 615. But a legal basis was previously unavailable if subsequent case law makes it easier to establish the claim and renders inapplicable factors that had previously been weighed in evaluating its merits. *See Ex parte Chavez*, 371 S.W.3d 200, 207 (Tex. Crim. App. 2012) (holding that the legal basis for a due process violation based on the State's unknowing use of false testimony was previously unavailable).

In addition to establishing the previous unavailability of the legal basis for his claim, the applicant must allege facts that, if true, would entitle him to relief on that basis.

*See Ex parte Staley*, 160 S.W.3d 56, 63 (Tex. Crim. App. 2005) (per curiam).

Applicant claims that his attorney violated his Sixth Amendment right to assistance of counsel by making a strategic concession of his guilt over his express objection. He argues that the legal basis for his claim was unavailable until 2018 when the Supreme Court issued its opinion in *McCoy*, 138 S. Ct. 1500. But the legal basis for Applicant's claim could have been reasonably formulated from existing precedent because *McCoy* was the logical extension of *Florida v. Nixon*, 543 U.S. 175 (2004), based on the factual distinctions—not legal ones—between the two cases. Furthermore, Applicant does not allege facts that would entitle him to relief under *McCoy*'s terms even if it were a previously unavailable legal basis for his claim. Consequently, we must dismiss his application. TEX. CODE CRIM. PROC. art. 11.071 § 5(c).

## II. Applicant's Confessions and Trial

Applicant was charged with capital murder for killing his pregnant ex-girlfriend, Lisa Underwood, and her seven-year-old son, Jayden, in the same criminal transaction.

Lisa was reported missing when she failed to show up for her baby shower. At her home, police found no signs of forced entry, but blood—later identified as hers—was on the walls, the furniture, and the floor in the living room. More blood was on the floor of the garage, and her car was gone.

Early that same morning, a deputy saw Applicant on foot, wet and covered in mud, near a creek. Applicant gave him a false name and fled into the nearby woods. Two days later, Lisa's car was found in the creek near which the deputy had encountered

Applicant.

Applicant became a suspect in Lisa and Jayden's disappearance when police learned that Applicant could be the father of Lisa's unborn child. Lisa had been asking Applicant to tell his wife about the pregnancy and to provide insurance for the child, but Applicant refused to do so without a DNA test confirming that he was the father.

Applicant confessed to the police that he had killed Lisa and Jayden and showed them where he had buried the bodies. He also met with his wife, Trish Barbee, in the interrogation room, and that meeting was recorded. Trish asked Applicant how he killed Lisa, and he tearfully explained that he "held her down too long" and "it was an accident." He also admitted to his ex-wife that he had killed Lisa and Jayden but that he had not meant to do so.

Before trial, Applicant wrote a letter to his appointed attorneys recanting his confessions. He stated that he initially told the police that he did not know what happened to Lisa and Jayden, he was not there, and he did not do it. He told defense counsel that the detective threatened him with the death penalty if he did not talk, so he said the killings were an accident: he and Lisa got into an argument, she kicked him, he hit her in the nose, he held her down too long, and he put his hand over Jayden's face until he stopped screaming. Applicant recanted his confessions and changed his story, ultimately claiming that he was innocent of the murders. Applicant said he helped bury the bodies after his ex-wife's boyfriend and Applicant's employee, Ron Dodd, killed Lisa and Jayden.

Faced with Applicant's confessions, defense counsel concluded that the "Dodd did it" theory would not work at trial, and they instead pursued the theory that Lisa's death was accidental. This theory was supported by Applicant's confessions and by the medical examiner's testimony.

Dr. Marc Krouse, the medical examiner who performed the autopsy on Lisa, testified that Lisa's death resulted from traumatic asphyxiation, possibly caused by smothering. He testified on cross-examination that, because Lisa was in a late stage of pregnancy, she was susceptible to smothering and might have stopped breathing after as little as thirty seconds of being held down.

The defense attorney summarized the theory in closing argument:

> As hard as it is to say, the evidence from the courtroom shows that Stephen Barbee killed Jayden Underwood. There is no evidence to the contrary. The problem in the capital murder case is the evidence in this courtroom that you heard doesn't show that Stephen Barbee had the conscious objective or desire or that he knew his conduct was reasonably certain to cause the result, those two definitions there. And it is supported by the testimony of the 25-year veteran of the medical examiner's office, Dr. Marc Krouse. Dr. Krouse told you that he could not be sure when Lisa Underwood lost consciousness . . . And Stephen Barbee's own words to his wife, it matches. That's the problem from their standpoint. What he told Trish Barbee is I held her down too long. That's exactly what matches the testimony of Dr. Marc Krouse. And as hard as it is to do, I submit to you that the evidence in this case, the conclusive beyond a reasonable doubt evidence, does not support an intentional or knowing murder for Lisa Underwood. Was he there? Yes. Did he hold her down? Yes. Did he know or intend that she was going to die or was that his conscious objective? The answer is no.

The trial court charged the jury on the lesser-included offenses of murder and manslaughter, but the jury found Applicant guilty of capital murder. Pursuant to the

jury's answers to the special issues, the trial court sentenced Applicant to death.

Applicant did not testify at trial or object to the defense strategy.

## III.  Relevant Procedural History

We affirmed Applicant's conviction and sentence on direct appeal.  *Barbee v. State*, No. AP–75,359, 2008 Tex. Crim. App. Unpub. LEXIS 900 (Tex. Crim. App., Dec. 10, 2008).

In his 2008 initial writ application, Applicant claimed that his Sixth Amendment right to the assistance of counsel was violated by trial counsel confessing his guilt to the jury during closing argument without his knowledge or consent.  Applicant alleged that he was abandoned by counsel at the trial stage and that it was structural error, meaning that prejudice should be presumed, citing *United States v. Cronic*, 466 U.S. 648 (1984).

The trial court recommended that relief be denied and entered findings of fact and conclusions of law, including that the right to effective assistance of counsel extends to closing arguments, counsel's decision to focus closing argument on the defensive theory of accident was reasonable in light of the evidence admitted at trial, and Applicant was provided adequate counsel in closing arguments.  We agreed with the trial court's recommendation and denied relief with written order.  *Ex parte Barbee*, No. WR-71,070-01, 2009 Tex. Crim. App. Unpub. LEXIS 5 (Tex. Crim. App., Jan. 14, 2009).  The Supreme Court denied certiorari.  *Barbee v. Texas*, 2009 U.S. LEXIS 5631 (Oct. 5, 2009).

Applicant filed a subsequent writ in 2011, complaining that his ineffective

assistance claim was analyzed under *Strickland v. Washington*, 466 U.S. 668 (1984), rather than the *Cronic* standard under which the claim was brought. We dismissed the 2011 subsequent application as an abuse of the writ. *Ex parte Barbee*, No. WR-71,070-02, 2013 Tex. Crim. App. Unpub. LEXIS 526 at *2 (Tex. Crim. App., May 8, 2013).

Applicant also raised this issue in his 2015 federal habeas petition. He claimed that counsel provided ineffective assistance by conceding his guilt to the jury without his permission, and he characterized it as abandonment by counsel subject to the Sixth Amendment standard in *Cronic*. *Barbee v. Stephens*, No. 4:09-CV-074-Y, 2015 U.S. Dist. LEXIS 88060 at *86 (N.D. Tex., July 7, 2015). The District Court determined that the claim was properly analyzed under *Strickland* rather than *Cronic* and denied the claim. *Barbee v. Stephens*, 2015 U.S. Dist. LEXIS 88060 at *87 ("For *Cronic* to apply, the attorney's failure to subject the state's case to meaningful adversarial testing must be complete.") (citing *Wright v. Van Patten*, 552 U.S. 120, 124 n.1 (2008)).

After the Supreme Court issued its 2018 *McCoy* opinion, Applicant filed this second subsequent application for writ of habeas corpus, claiming that his trial attorney overrode his Sixth Amendment autonomy right to insist on his innocence. Because this is a subsequent writ, the merits of Applicant's claim cannot be considered unless it meets the requirements of Article 11.071, Section 5.

## IV. *McCoy v. Louisiana*

*McCoy* applied longstanding jurisprudence related to defendant autonomy and structural error to a "stark scenario," holding that a capital murder defendant has the right

to insist that his counsel refrain from admitting guilt of the charged offense. *McCoy*, 138 S. Ct. at 1510-11. The violation of that right "was complete when the [trial] court allowed counsel to usurp control of an issue within McCoy's sole prerogative[,]" thus foreclosing any need to demonstrate prejudice. *Id.*

McCoy was accused of having killed his estranged wife's son, mother, and stepfather, and the evidence against him was strong. *Id.* at 1505-06. But he maintained that he was innocent and that the victims had been killed by police in a drug deal gone bad. *Id.* at 1506. McCoy instructed his attorney to pursue an outright acquittal and not to concede guilt, but the attorney saw that as a futile effort that would make the death penalty inevitable. *Id.* McCoy protested to the trial court before and during trial that he was innocent and that his attorney was "selling him out" by making the concession. *Id.* McCoy's protestations were futile. The trial court instructed the defense attorney to try the case as he had planned, refused McCoy's request for time to hire a new lawyer, and cautioned McCoy against making outbursts in front of the jury. *Id.* at 1506-07.

In opening statement the attorney told the jury, "my client committed three murders." *Id.* at 1507. In closing argument he said that McCoy was the killer and that he took the burden off the prosecutor on that issue. *Id.* Defense counsel conceded at punishment that McCoy committed the crimes but urged the jury to consider McCoy's mental and emotional issues. *Id.* On appeal McCoy argued that his constitutional rights were violated by his attorney conceding guilt over his objections. *Id.* The Supreme Court agreed.

**IV.A. Sixth Amendment Assistance of Counsel**

The Supreme Court noted that to gain the assistance of counsel, "a defendant need not surrender control entirely to counsel." *Id.* at 1508. The Sixth Amendment "speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant." *Id.* (quoting *Faretta v. California*, 522 U.S. 806, 819-20 (1975)). Trial management is the attorney's province, but some decisions belong to the defendant, for example: "whether to plead guilty, waive the right to jury trial, testify in one's behalf, and forgo an appeal." *McCoy*, 138 S. Ct. at 1508 (citing *Jones v. Barnes*, 463 U.S. 745, 751 (1983)).

The Court concluded, "Autonomy to decide that the objective of the defense is to assert innocence" is reserved for the defendant. *McCoy*, 138 S. Ct. at 1508. "Just as a defendant may steadfastly refuse to plead guilty in the face of overwhelming evidence against her, or reject the assistance of legal counsel despite the defendant's own inexperience and lack of professional qualifications, so may she insist on maintaining her innocence at the guilt phase of a capital trial." *Id.* *McCoy* derived the defendant's right to assert innocence against counsel's advice from the defendant's right to decide whether to plead guilty and from his right to reject the assistance of counsel. *Id.* (quoting *Faretta*, 422 U.S. at 819 and citing *Barnes*, 463 U.S. at 751).

Such decisions are not "about how best to achieve a client's objectives; they are choices about what the client's objectives in fact *are*." *McCoy*, 138 S. Ct. at 1508 (citing *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017), and *Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.*, 528 U.S. 152, 165 (2000) (Scalia, J., concurring in

judgment)). When a defendant "expressly asserts that the goal of '*his* defense' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt." *McCoy*, 138 S. Ct. at 1509 (quoting and emphasizing U.S. CONST. AMEND VI). Once McCoy communicated "to court and counsel" that he "strenuously" objected to counsel's proposed strategy, "a concession of guilt should have been off the table." *McCoy*, 138 S. Ct. at 1512.

The *McCoy* majority dismissed the dissenting opinion's claim about the rarity of attorney-client disagreements over conceding guilt and noted that three state supreme courts other than Louisiana's had addressed the issue. *Id.* at 1510. It pointed out the similarities of those cases to McCoy's case, namely, "the defendant repeatedly and adamantly insisted on maintaining his factual innocence despite counsel's preferred course: concession of the defendant's commission of criminal acts and pursuit of diminished capacity, mental illness, or lack of premeditation defenses." *Id.* (citing *People v. Bergerud*, 223 P.3d 686, 690-91 (Colo. 2010); *Cooke v. State*, 977 A.2d 803, 814 (Del. 2009); and *State v. Carter*, 14 P.3d 1138, 1141 (2000)). *McCoy* said that "these were not strategic disputes" but "intractable disagreements about the fundamental objective of the defendant's representation." *McCoy*, 138 S. Ct. at 1510. "In this stark scenario, we agree with the majority of state courts of last resort that counsel may not admit her client's guilt of a charged crime over the client's intransigent objection to that admission." *Id.* *McCoy* then turned its attention to prejudice.

**IV.B. Structural Error/Presumed Prejudice**

*McCoy* said counsel's admission of a defendant's guilt over his express objection was structural error meriting a presumption of prejudice for "at least" two reasons: the effects of the error are too hard to measure, and the right at issue is designed to protect "the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty." *Id.* at 1511 (quoting *Weaver*, 137 S. Ct. at 1908).

McCoy opposed his counsel's assertion of his guilt "at every opportunity, before and during trial, both in conference with his lawyer and in open court." *McCoy*, 138 S. Ct. at 1509. McCoy had an outburst in court, objecting to his own counsel's opening statement. *Id.* at 1506-07. McCoy testified to facts in complete opposition to those raised by his counsel. *Id.* at 1507. Defense counsel relieved the State of its burden to prove guilt beyond a reasonable doubt. *Id.* And the trial court erred in knowingly allowing defense counsel to violate McCoy's Sixth Amendment rights. *Id.* at 1506. The error was structural because it impacted the framework within which McCoy's trial proceeded. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006) (violation of certain rights is structural error when it impacts the framework within which the trial proceeds). McCoy's trial contrasted with Nixon's, and that contrast justified the different approaches to their cases.

**IV.C.  *Nixon* vs. *McCoy***

Like McCoy, Nixon claimed that his attorney violated his Sixth Amendment right to counsel by conceding his guilt without his consent. *Nixon*, 543 U.S. at 185. But

Nixon did not expressly object to the strategy; when it was explained to him, he was unresponsive. *Id.* at 181. This unresponsiveness was the key to the Supreme Court's rejection of the Florida court's opinion that the attorney's concession was presumptively deficient performance and prejudicial.

*Nixon* held that the concession was not unreasonable given Nixon's unresponsiveness. *Id.* at 189. "Nixon's characteristic silence each time information was conveyed to him, in sum, did not suffice to render unreasonable [his attorney's] decision to concede guilt and to home in, instead, on the life or death penalty issue." *Id.* And *Nixon* held that a presumption of prejudice would not be "in order based solely on a defendant's failure to provide express consent to a tenable strategy counsel has adequately disclosed to and discussed with" him. *Id.* at 181. If Nixon had objected, then, the concession might have been unreasonable and a presumption of prejudice might have been warranted. Presented with such facts, *McCoy* took *Nixon* to its next logical step.

*McCoy* noted that *Nixon* was not contrary to its holding but was distinguishable because McCoy, unlike Nixon, adamantly objected to the admission of guilt at every opportunity, before and during trial and in and out of court. *McCoy*, 138 S. Ct. at 1509. If a defendant "declines to participate in his defense, then an attorney may permissibly guide the defense pursuant to the strategy she believes to be in the defendant's best interest. Presented with express statements of the client's will to maintain innocence, however, counsel may not steer the ship the other way." *Id.* (citing *Gonzalez v. United States*, 553 U.S. 242, 254 (2008) (Scalia, J., concurring in judgment) (distinguishing

"action taken by counsel over his client's objection" from defendant's failure to personally express to the court his consent to waive certain rights)). Counsel "must still develop a trial strategy and discuss it with her client, explaining why, in her view, conceding guilt would be the best option." *McCoy*, 138 S. Ct. at 1509 (citing *Nixon*, 543 U.S. at 178).

Although both Nixon and McCoy claimed that their Sixth Amendment rights were violated by counsel conceding guilt without their permission, the differences between their trials yielded different analyses. McCoy did not have to show prejudice because, unlike Nixon, (1) McCoy told his attorney that his defensive objective was to assert innocence at trial, (2) he told the trial court before and during trial that his attorney was conceding his guilt against his wishes, and (3) the trial court nevertheless allowed defense counsel to make the concession, causing structural error.

**V. The Legal Basis for Applicant's *McCoy* Claim Was Previously Available**

*McCoy* was founded on "familiar legal principles" that dealt with the division of labor between attorney and client, *Barnes*, 463 U.S. at 751, the duty of the attorney to consult with his client about important matters, *Nixon*, 543 U.S. at 189, the client's exclusive right to make fundamental decisions about his own defense with the assistance of counsel, *Faretta*, 422 U.S. at 819, and structural error, *Gonzalez-Lopez*, 548 U.S. at 150. *See St. Aubin*, 537 S.W.3d at 34.

*McCoy* was a logical extension of *Nixon* and "could have been rationally fashioned" from it. *See Navarro*, 538 S.W.3d at 615. *Carter* and *Cooke* demonstrated as

much. *See Carter*, 14 P.3d 1138 (relying on, e.g., *Faretta* and *Cronic* to hold that guilt-based defense imposed against defendant's wishes violated Sixth Amendment right to counsel); *Cooke*, 977 A.2d 803 (relying on, e.g., *Faretta*, *Nixon*, and *Cronic* to hold that the defendant was denied counsel and presumptively prejudiced when his attorney pursued a guilty-but-mentally-ill strategy over his objection).

*McCoy* did not make it easier to establish a claim. *See Chavez*, 371 S.W.3d at 207. *McCoy* merely required factually what *Nixon* explicitly lacked: a defendant's express objections to a concession of guilt disregarded by counsel and court and aired before a jury during trial. Since the structural error analysis flowed from those requirements, *McCoy*'s presumption of prejudice was not an abandonment of factors previously weighed, either; it was an addition of factors.

Applicant argues that the legal basis for his claim was previously unavailable because *McCoy* was the first case to uphold a defendant's Sixth Amendment right to decide the objective of his defense, and its focus on the defendant's wishes represented a departure from *Strickland*. Even so, that is not the test for a previously unavailable legal basis. Applicant points to *McCoy*'s purported disclaimer of Supreme Court ineffective-assistance-of-counsel (IAC) jurisprudence where it said, "Because a client's autonomy, not counsel's competence, is in issue, we do not apply our [IAC] jurisprudence, [*Strickland*, 466 U.S. 668] or [*Cronic*, 466 U.S. 648]." *McCoy*, 138 S. Ct. at 1510-11. But that disclaimer related to the showing of prejudice "ordinarily" required for IAC claims. *Id.* at 1511. The violation of McCoy's right was "complete" when the trial court

allowed it to occur, and a showing of prejudice was thus unnecessary. *Id.* Significantly, *McCoy* did not cite *Nixon* in connection with its disclaimer and instead contrasted it based on the factual differences between the two cases. *McCoy*, 138 S. Ct. at 1509.

The legal basis for Applicant's current claim was previously available under the terms of Article 11.071, Section 5. Even if it were not previously available, Applicant does not allege sufficient facts to show that his claim meets the requirements of *McCoy*.

## VI.  Failure to Allege Sufficient Facts

Applicant seeks to distinguish his *McCoy* claim from other such claims that have been dismissed by this Court under Article 11.071, Section 5. Unlike those cases, he argues, his application "contains extensive evidence demonstrating that he informed his lawyers that he wished to maintain his innocence." But it does not. His exhibits include evidence that he told various people, including his attorneys, that he was innocent, he would not plead guilty, and Dodd killed Lisa and Jayden; he told the forensic psychiatrist that he would rather be executed than have his mother see him "plead guilty"; he complained to the trial court about a "breakdown in communication" with his attorneys; his attorney did not "explicitly" tell him that his closing argument would concede Applicant's identity as Lisa and Jayden's killer; and Applicant was "shocked" when he heard the argument. These facts demonstrate that Applicant told his attorneys that he was innocent; they do not demonstrate that he told them that his defensive objective was to maintain his innocence at trial. Thus, the application fails to allege facts that, if true, would entitle him to relief under *McCoy*.

## VII. Conclusion

The legal basis for Applicant's claim was available when his previous applications were filed, and Applicant has not alleged facts that, if true, would entitle him to relief under *McCoy*. This subsequent application does not meet the requirements of Article 11.071, Section 5, and we dismiss it as an abuse of the writ under Section 5(c).

Delivered: February 10, 2021

Publish